Good morning. May it please the court, my name is Joe Pertl and I represent the appellant J.H. Kelly LLC. I'd like to reserve two minutes of my time for rebuttal, please. Go ahead and just watch your own time, that's certainly fine. Today I hope to address three arguments, Your Honors. First, that the district court erred in dismissing the amended complaint with prejudice and without leave to amend. Second, that the amended complaint sufficiently pleads facts and complies with Rule 9b. And third, that the district court's failure to accept well-pleaded allegations as true and making reasonable inferences in favor of the appellant as the non-moving party was error and justifies remand. With respect to no leave to amend, the Ninth Circuit case law is very clear that leave should be granted even when it is not requested by a party unless the court makes specific findings. I want to skip this part because we know that part. Okay. Effectively, that no amendment could save it. In this case, the district court didn't make any findings whatsoever as to sufficiency of amendments curing any sort of pleading defect. What the court did was in the because J.H. Kelly did not ask for leave to amend, that it was dismissing the complaint with prejudice. That is clear error and it's sufficient error to allow the case to be remanded with an instruction to allow an amendment to occur. Did you ask Judge Windmill for a further opportunity to amend? No, Your Honor. We didn't have an opportunity to do so. There was no argument on the motion in front of Judge Windmill. He simply issued a decision with that fine. So there was the first, the initial complaint, a first amended complaint, and that's it? Yes, Your Honor. Okay, go ahead. Without any findings, it's difficult and it is, there's some confusion in the appellate briefing, Your Honors, as to the appropriate standard for review of this case. J.H. Kelly has indicated that it's a de novo standard because it was a motion to dismiss without leave to amend. Counselor, your time is ticking. Could I, if you could forgive my interruption, could you go straight to it and let me know what you think is your very strongest argument in response to the Rule 9 order? Factually, what's your strongest? That the facts alleged in the complaint sufficiently indicate that the fraud was, or the false statement was a promise of having money in place to pay for the construction costs that had been incurred and that would be incurred in the future. What's your very strongest citation to the record? Because you know what their argument is. Their argument is that these were statements of promises, statements of intent, statements that didn't really cut it under Rule 9. So what is your very strongest? And can you give me the record? Pages 39 through 42 and 44. Okay. So are you relying on the November 17 emails? Yes, and prior statements. September 2010 statements by Mr. Shaw in emails to J.H. Kelly. Those statements indicate that the appropriate financing will be in place until completion of the project. That statement cannot be reasonably inferred to be an opinion, a promise of putting money there in the future. And what goes to it as well, Your Honor, are our references and citations to the district court, to the 10 Q's for the Hoku companies. Those two, excuse me, 10 Q's indicate that there wasn't sufficient financing in place at the time the 10 Q's were issued, and they were for two different time periods. One was for the end of the third quarter 2011, and one was for the end of the fourth quarter. Does your complaint allege that when Hoku or Taiwei made these assertions, promises, I think you refer to them as, that they knew when they made them that they weren't true? Yes, Your Honor. It's in the fraud section of the amended complaint. I believe it's paragraph 55. I may be mistaken on the exact number, but I believe it should be at excerpt of record page 44. But those allegations are that the the statements were false when made, and that they knew that they were false, because as executive officers of not only Tianwei for the most part, but also the Hoku entities, they were aware of the the true financial circumstances, and the the truth of those financial circumstances were set out even further in the 10 Q's, which are not, the 10 Q's were not alleged in the amended complaint, but they were referred to the court in response to the motion to dismiss. Counsel, if we look at the November 17 emails, the first one sent by Mr. Paul, who I think only wore one hat, most of these folks seem to have worn two hats in both the organizations, but not Mr. Paul, unless I'm mistaken, and he wrote Hoku Tianwei is not a credit risk, and then as I understand the record, I should say your allegation in your amended complaint, within one hour another email went, although not by Mr. Paul, right? And that one said we owe JHK about 20 and we don't have a clear payment plan, right? Yes, that's Mr. Zhang's email. Right, and so that second email, it could mean we don't have a clear payment plan, could mean we don't plan to pay them, or it could mean we're not sure how we're gonna do that. And I think you're correct, Your Honor, and the important fact to remember, the important thing to remember is that we're at the pleading stage, and as a non-moving party, that whether it could mean this, could mean that, is a reasonable inference that I think should be drawn in favor of the non-moving party, JHK. What happened in this case was a district court took any sort of benefit of doubt and gave it in favor of the moving parties and dismissed the case with prejudice, which was error. It's not like he snuck up on you. This is the third complaint, right? The second complaint, Your Honor. Forgive me, the amended complaint, right? Yes. So, but it's it's the Rule 9 standard and we all know about the who, what, where, where, why, and how. And to the extent this is capable of two different reads, it seems that you have a problem. And if we do have a problem... They're gonna get up and say that it's not sufficiently specific, right? That it doesn't, it's not unequivocally a statement of fraud. Correct. And and what happened below was the court, in analyzing the allegations, determined that the statements, the false statements, as we have alleged, were promises, failed promises of future payment, which under Idaho case law is insufficient to plead a claim for fraud, which would also be insufficient for a RICO claim based on wire fraud. And the problem with that is the allegations, the plain reading of the allegations and the complaint are not failed promises of future payment. They are failed promises of actually having the money in place at the time. And the contract with HOKU at the outset was a cost-plus incentive contract, which was one that required HOKU to actually have the money up front. J.H. Kelly would give HOKU a budget of what it planned for construction costs for the month going forward. That money would then be given to J.H. Kelly and then they would go and do the work. This was unconventional financing and that was why those allegations later on about having the money in place and being able to pay for not only work that had been done, wasn't paid for, but having money in the future to pay them for the continued work was so important. Did you want to reserve some time? I do. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is James Smith. I'm representing defendants Mike Jong and Sean Liu. Joining me as co-counsel are Mike Rowe for Defendant Tian Wei and Kelly Cameron for individual Defendant Wei Xia. I'd like to, unless there are questions that the Court would like to go directly to an issue, I will address the sufficiency of the fraud pleading and I will reserve a little bit of time for Mr. Rowe to address the Court as to any questions on the dismissal without leave to amend and for Mr. Cameron to address any questions specific to Defendant Xia. Well, I have a question. I appreciate the invitation. I'm looking at the November 17 emails, as I've just explained, and arguably, I think the second one, there's a question about what it means. We don't owe, sorry, we owe JHK about $20 million and we don't have a clear payment plan. It could mean we don't know how we're going to pay it. It could mean we don't plan to pay it. But what if that email is juxtaposed against the November 7 email, the earlier emails, that seem to indicate that the only thing preventing J.H. Kelly from receiving its funds was a signature or a banking policy that prevented the money from actually being transferred? Yes, I appreciate the comparison there and I think the issue is, all of that goes to Hoku's concerns about receiving this money and needing to get it. And it is completely consistent with what else was explained to J.H. Kelly, that money was delayed or there were timing issues in actually receiving the money from Tianwei's coffers in China. And all the while, Kelly was working on the project, right? That's correct. That's correct. And the longer they worked on the project, as it turned out, the more loss they were absorbing. I mean, there's no mystery in what Kelly's complaint against all of your respective clients is. You were sort of shining them along, that's what we would say down in the desert, while they continued to work and incur expenses, right? Yes, sir. I mean, whether the complaint is sufficient, and we'll decide that as a matter of law, you were not fooled in any way by what this complaint was saying. You just simply say it's not true. I would agree with that as a general theory, Your Honor, that J.H. Kelly alleges it was false. However... Strung along. That's what they're saying, that you just get promise, promise, promise. We have the same expression in Alaska, by the way, right? They're just stringing them along. So what's the answer to that? Right. And being strung along with allegations that J.H. Kelly alleges are false, that's fine as a beginning or as a theory. However, it's a question of what facts are alleged with particularity to support that theory. So let's go to that with particularity. Isn't there a difference between the check is in the mail, and I'm going to do everything possible to put the check in the mail? And you guys are really taking the position as they sort of skirted the issue, and they're really saying it's not fraud stated with particularity, because we said we'd do everything possible. We'll promise that we'll put it in the mail. And they actually had to say the magic words, the check is in the mail, for it to be stated with particularity. But didn't they just do that at paragraph 35 of the complaint, which is in the record at 39, where they state on multiple occasions during 2011, Mr. Zhang and Mr. Paul acknowledged the delinquent payments and stated to J.H. Kelly that Tianhui then had in place all required financing requirements for completion of the project. Isn't that enough to state fraud with particularity? Not in this context, Your Honor. Why not? Because the clear distinction drawn throughout the complaint and in J.H. Kelly's various arguments is that they were looking to Tianhui to have this money, not for Hoku to have this money. And so when the folks at Hoku are relaying information that Tianhui has this, that it's been committed on Tianhui's end. They may be two different companies, but they're like first cousins, aren't they? I mean they they're interlocking officers and directors, etc., right? Yes, that's what's alleged. And Tianhui, as the parent company, is sending this money, or has committed, in J.H. Kelly's argument. Okay, I agree, but in a vacuum. But then at paragraph 37 of the complaint, and that's also at the record at 39, it says Hoku has enough budget to complete the current contracts. So that's a specific reference with Hoku. So you're right, if it was just in a vacuum and they said Tianhui is going to commit these funds, you're right, that's a promise. They're not contractually obligated to J.H. Kelly, but Hoku is. And at the same time they're making these types of comments that can be read together, their filings with the SEC show they clearly aren't monetized to do that. So isn't that a particularity? I believe, Your Honor, that goes back to the distinction of whether Hoku has money that it can track on its books for purposes of, let's say, the SEC filing, or whether it is still waiting to have received that, being that there are procedural hurdles, or signatures, or bureaucrats. But there was a, going back to, since you mentioned procedural hurdles, following up on Judge Kobayashi's statement and the analogy to the check being in the mail, there is a place in the record, in the chronological sequence, where the representation to J.H. Kelly was that the only thing preventing the money from coming to Idaho, essentially, was out of their control. It was a government regulation. What about that? I think that goes to the exact question of that there are circumstances at play. And the argument by J.H. Kelly is really that when money doesn't arrive to pay J.H. Kelly, when they never receive it, then it could never have been committed. Well, counsel, with respect, I don't think you're answering the question. We're asking the same question, both of us. There's a place in this chronology where, as I read the record, and I'm inviting you to correct me if I'm wrong, where the defendants really had represented that they had done all they could do. They were no longer even waiting for Mr. Xia's signature, that the money was actually not only funded, but that it would be there as soon as the Chinese government's regulation regarding the flow of currency allowed it. In other words, it was in the queue. What about that? Yeah, well, I think that focuses the main problem, being that the defendants in this case aren't told, with particularity, what exactly was wrong with those representations and when it was wrong. They didn't get the money. They understand what they were told is that all the money was there, it was funded, they were no enough, but it was, as Judge Kobayashi said, to use apparently something that Alaska shares with Hawaii, that the check was in the mail. Right, and that's a commitment to do that, to send the money. Right. It's a commitment on the part of Tianwei, or that's what was represented. It's actually a statement, what they're arguing, and forgive me for interrupting, they're arguing it's not a statement of future intent, a commitment to pay, it's a statement, we've sent it. We're just waiting for the mail carrier to deliver it to you, but, you know, or, you know, it's in the bank, basically, all you have to do is draw on it. And maybe then we should look at it from the perspective of what J.H. Kelly has alleged, and they've alleged that what was false about the representations, the reason it was false in this whole context, is that Tianwei did not have committed financing for the project, and when that is their theory, that's really what they need to support with these particular facts. We're not told how much money J.H. Kelly had, and when they had it. We're not told what J.H. Kelly had committed to do, or intended to do, with some amount of money that it had. And there isn't a way to line up some truth about Tianwei's financial resources. First, none has has been alleged, but second, it hasn't been alleged with respect to a particular time period, and certainly not that we could reliably line up with allegations where they say that regularly throughout 2011, or at times in 2011. This is not a case, as I understand it, correct me if I'm wrong, where Kelly said, we don't need to amend. We stand on the complaint. They wanted the opportunity to further amend, correct? I understand that they're asking for that now, or saying they should have been granted that now. But they didn't tell Judge Windmill, we're standing on this complaint. We don't need to amend. Correct? That's correct, and I will yield the rest of my time to co-counsel if the court has no further questions. Thank you. Good morning. Mike Rowe, I represent Tianwei New Energy Holdings Company Limited, and as my co-counsel Mr. Smith said, I was to address the leave without, or dismiss without leave to amend. So if the court has any questions, glad to entertain them, or I'll go straight to my strongest argument, which is, I think under the case law, we have two factors that militate toward upholding Judge Windmill's decision. First, J.H. Kelly had repeated opportunity to amend its complaint. Why? It had its original complaint, it had its amended complaint, and now today I haven't heard any additional argument, new facts, new circumstances that would bolster J.H. Kelly's argument today at appeal. Unlike the plaintiffs in Maya, cited in the appellant's briefing, or Menschreck, where counsel at the appellate argument pointed to additional factors that could be alleged. So theoretically, they have three opportunities to fix their deficiencies and haven't been able to do so. Secondly, and almost as importantly, under the five-factor test, I think any further opportunity to amend would be futile. As suggested in the Zucco Partners case, when a plaintiff has had multiple opportunities, and in this case with specific instructions from Judge Shubb and Judge Windmill, and they fail to fix those pleadings, that's very strong evidence that they've taken their best shot and been found wanting to use the court's language. But doesn't the district court have to make specific findings about futility before we can, on the appellate level, find that? And Your Honor, I've purposely collapsed that and gone to the five-factor test and conceded for the point, for the purposes of argument, that we will get there. Right, so you're saying it would be an act of futility to send it back on that issue because those five factors could be shown. That's correct, Your Honor, and more specifically, it isn't as though that J.H. Kelly was blindsided by this decision like the plaintiff in Masaryk. In this case, Judge Shubb gave very specific instructions about what he found lacking in the pleading, gave J.H. Kelly 20 days to amend. They did, and then in Judge Windmill's decision, he points to that very same deficiency. So there is a linkage, and I don't think it's fair for J.H. Kelly to argue that there was no explanation in Judge Windmill's decision. I think... Counsel, if I could, you're over your time, but I agree that in defense of the district court, there were a lot of allegations here that don't rise to the level of satisfying Rule 9. But I look at the November 17th emails, including saying, you know, we don't have a plan, we don't have a clear plan, and yet on November 7, 10 days earlier, they were told the delay in payment was due only to lack of Mr. Shah's signature. So there's a lot of static, but when it boils down to this, why isn't this a statement of fraudulent... sufficient to support the amended complaint? It's allegation of fraud right here. The November 7 and November 17 emails. Why aren't those enough? Yes, Your Honor, I can't answer that question any better than Mr. Smith did. I would say that as the court, as the U.S. Supreme Court suggested in Iqbal, this analysis really is one that's context-specific, where the district court is called upon to use its experience and its common This was a project that cost over 700 million dollars and was at the five-year mark, or four-and-a-half-year mark, when these transactions occurred. This conversation, this back-and-forth, this static, Your Honor, was occurring all over the world thousands of times a day. This isn't a fraud or a RICO case. This is a breach of contract and a collection case. And that's the difficulty that Mr. Pirtle is having in trying to drive a square peg into a round hole. This simply isn't a fraud case. Thank you. Thank you. Why isn't he right? This is a collection case, not a fraud case. This was a case where J.H. Kelly stayed on site and changed the terms, the payment terms, for its contract based on representations that were false. That is fraud. They certainly changed their position based in reliance on those statements. And to address Mr. Rowe's concern about the fact that we haven't come forward with new facts, I would submit that that is not part of the record from below. If the court wishes, I can go into allegations that we would make if we are granted leave to amend. It's a little bit of speculation at this point, but suffice it to say that... Ordinarily, in a case like this, we have a motion for leave to further amend with an attached example of what the third amended complaint, I guess in this case, would look like. And we can look to that, but we don't have that. Right. And I think that's part of the error, Your Honor, that there was no opportunity to do that. We simply got the decision from Judge Windmill, and at the same time also got a judgment. Did you move to reconsider? No, we did not, Your Honor. We filed our notice of appeal instead. Counsel, at ER 40, the other part of this November 17, the second November 17 email, said the $20 million is essentially a big retainage. And of course, retainage being a term of art in the construction industry context. In front of the district court, was there any argument or discussion about that term of art? No, there wasn't. And again, we did not have an opportunity to present any argument on the second motion to dismiss. Thank you. Thank you. Thank you, both sides. Thank you very much. Thank you, counsel. We'll go on to the
judges: Hawkins, Christen, Kobayashi